Corning *v.* Troy Iron and Nail Factory.

Judgment accordingly.

[ALBANY GENERAL TERM, September 1, 1862. *Hogeboom, Peckham* and *Miller*, Justices.]

CORNING & WINSLOW *vs.* THE TROY IRON AND NAIL FACTORY.

A lease, under which the defendants had held certain premises, expired on the 1st of February, 1852; the defendants had six months thereafter, to remove buildings &c.  On the 23d of July, 1852, a deed of the premises was executed to the plaintiffs, the defendants being at the time still in the possession; but they had made no open or notorious claim of adverse possession. *Held*, that they were to be deemed tenants holding over, or persons claiming possession under the former title, and not as holding under an adverse title.

Although a right of action to recover for damages already sustained, prior to the execution of a conveyance, may well be deemed to remain in the grantor, yet a right of action or remedy for future encroachments upon the grantee's rights — as for a neglect or refusal to restore the waters of a stream to their accustomed channel — resides in the grantee of the lands.

The right to have the waters of a stream flow in their natural bed, passes by a conveyance of the adjoining and subjacent soil, as a necessary and inseparable accompaniment or incident to the ownership of such adjoining soil.

Corning *v.* Troy Iron and Nail Factory.

This is as absolute and fixed a right, arising out of the relations of a riparian proprietor to the waters of the stream flowing over and along his lands, as the right to the soil itself; and is never separated or disconnected from the land until the right itself becomes extinguished by twenty years adverse possession.

The right to the water is a natural, permanent and inseparable incident or accompaniment to the ownership of the soil, and is incapable of being divested by the act of any wrongdoer, until 20 years adverse enjoyment have ripened the original wrong into a legal right.

The most unquestionable evidence of the intentions of the parties to the contrary, is requisite, to justify the inference that such water-right was not designed to be conveyed with the land.

In order to estop the owner of a water right, in equity, from enforcing his right, on the ground of his knowledge of, and acquiescence in the making of expenditures and improvements thereon, by another, the consent and agreement of such owner thereto ought to be established by the clearest and most satisfactory evidence.

Where a lessee, under a lease having 13 or 14 years yet to run, diverted a water-course, and made large expenditures and improvements thereon; *Held*, that such diversion would not be presumed to have been intended to be perpetual or permanent, or extending beyond the duration of the term, so as to require a protest on the part of the owner of the land, under the penalty of being estopped in equity from afterwards objecting.

An estoppel can never arise, founded upon an omission to object to an act or a declaration, when such act is perfectly justifiable, or such declaration perfectly true.

It is because a party stands silently by and sees an injurious and unwarrantable act done to his property, or hears a false and injurious declaration made, affecting his rights, and does not protest against it, that he is regarded as tacitly acquiescing in the propriety of such act, or the truth of such declaration, and shall not be permitted thereafter to question it when such a course would work damage to an innocent party.

Notwithstanding the right to sue at law for damages, a suit in equity may be maintained, for an injunction to restrain the defendants from diverting a water-course from its natural bed or channel through or along the plaintiff's lands, and from drawing and using the water by means of such diversion, and by decree compelling the defendants to restore the waters to their natural bed or channel.

Special damages need not be averred, in order to entitle a party to an injunction, in such a case.

The interference of a court of equity, in cases of this description, may be justified on the grounds that it makes the relief final and comprehensive, avoids a multiplicity of suits, and is equally effective with an action at law in preventing the adverse possession of the defendants from ripening into a hostile and perfect title.

APPEAL from a judgment of the Rensselaer circuit and special term, dismissing the plaintiffs' complaint with costs. The action was tried before Justice Ingraham, without a jury, at a circuit court and special term, held at the court house in Troy, on the 12th day of October, 1861. The action was brought to obtain an injunction against the defendants, restraining them from diverting the waters of the Wynant's kill, in the city of Troy, in the county of Rensselaer, from their natural bed or channel, through or along the lands of the plaintiffs, by means of a ditch or trunk, or otherwise, and from drawing and using the same by means of such diversion, and compelling the defendants to restore said waters to their natural bed or channel, and to pay the plaintiffs such damages as they had sustained by reason of such diversion, and for general relief. The plaintiffs are owners and occupants of a lot called the "Seven-acre lot," on the north side of the Wynant's kill, but whose exterior boundaries, as contained in the deed of conveyance, embrace also land on the south side of the creek. Said deed, after the description of the premises, contains the following clause: "Excepting and reserving out of the above described premises, one acre of land on the south side of the creek, and adjoining to the creek where the line crosses the said creek, unto Stephen Van Rensselaer, Esq. his heirs and assigns." This excepted acre lies on the south side of the creek in a bend of the stream, opposite to the plaintiffs' land, on the north side of the creek before mentioned, and is claimed and occupied by the defendants. The action was first tried before Justice Wright, who made a decree dismissing the plaintiffs' complaint without costs, and without prejudice to an action at law to recover damages for the alleged diversion of the waters of the Wynant's kill. On appeal, the judgment rendered by him was reversed, and a new trial granted with costs to abide the event. The case is reported in 34 *Barb.* 485–494. On the second trial before Justice Ingraham, now

brought up for review, he made the following findings of fact and of law :

1. That the plaintiffs, by sundry conveyances, are the owners of the seven-acre lot as formerly owned by David Defreest, under conveyances executed to them in 1852 and 1856 by the devisees of David Defreest. 2. That the defendants are the owners and are in possession of the reserved acre on the south side of the creek, and adjoining to the creek, and were in possession thereof prior to the plaintiffs' conveyances, under deed from William Van Rensselaer, dated 1st February, 1847, having held the same previously under lease from S. Van Rensselaer, dated 28th November, 1832. 3. That the boundary of the defendant's land is the creek. 4. That prior to 1839 all the water of the creek which passed over the bed of the creek, excepting that what was used for the shovel factory, was returned to the creek at or near the place from which it was taken. 5. That in 1817, the seven-acre lot was leased by Defreest to Converse for thirty-four years and nine months, and that such lease was afterwards and until its expiration held and owned by the defendant. 6. That in or about the year 1839, the defendant commenced and completed an alteration in their works, by which alteration the greater part of the waters in the creek were taken, by means of a dam erected across the creek, above the lands of the plaintiffs, and were carried through an artificial channel built on the defendant's land to the defendant's works, and were not returned to the bed of the creek until they reached a point below the seven-acre lot, and that such alteration was of a permanent character. 7. That the Defreests then owned the seven-acre lot, but the same was leased to Converse and such lease was held by the defendant, and that Abraham W. Defreest, acting for himself and the other owners, assented to the diversion, urged the completion of the works intended for that purpose, and expressed his fears that this defendant had not the means to complete it. 8. That Defreest wished the completion of the works, from an expec-

tation on his part of a large increase in population in consequence of the increased works, and of a rise in the value of his property from the increased demand therefor, which was communicated to Burden. 9. That at the time Defreest was informed of the nature of the improvements, and must have known their permanent character, and resided in the vicinity of the works. 10. That there is no evidence to show that Defreest, down to the time of the conveyances to the plaintiffs, ever objected to the diversion of the waters by the defendant. 11. That at the time of those conveyances, the diversion of the waters to the defendant's works was in full force, and that such diversion was permanent. 12. That at the time of those conveyances to the plaintiffs, the defendant claimed the right to use the water as diverted to their works with the consent of Defreest, and that such claim was adverse to any supposed right of Defreest to have the waters returned to the bed of the creek along the line of the seven-acre lot. 13. That the works of the defendant have been erected at large expense, and applied to the use of the water as diverted, after the assent of Defreest thereto. 14. That a restoration of the water to the bed of the creek would require an alteration of the wheel and other works connected therewith at a large expense. 15. That the plaintiffs or their grantors have not at any time since the expiration of the lease, had any means on the seven-acre lot for the use of the water if it had flowed through the bed of the creek. 16. That the fall of the creek on the line of the seven-acre lot from the upper to the lower boundary of such land is $5\frac{61}{100}$ feet, and would furnish a water power sufficient to run one run of stones, grinding 18 to 20 bushels per hour, or a cotton mill with 40 looms, or what would be equal to about a 20 horse power. 17. That there have been no works requiring the use of the water on the plaintiffs' land (the seven-acre lot,) erected either by Defreest or the plaintiffs, and none now exist thereon. 18. That since 1839, the waters diverted by the defendant above the seven-acre lot of

the plaintiffs, have been returned to the creek at a point below the west line of the lot. 19. That the waters in the creek could be used for the erection of works on the seven-acre lot by the use of shafting, but that it is doubtful whether the whole power could be obtained except by running a dam across the stream. 20. That there was in 1852 and subsequently, a dam across the creek, by the shovel factory, about five feet high, which was removed about 1841 or 1842. 21. That in 1851 or 1852, the defendants enlarged their works, building their large wheel of 60 feet diameter, and the water was then taken from the reservoir dam. 22. That in order to alter the work so as to return the water to the creek at the place where it was formerly returned, the wheel must be raised $5\frac{1}{2}$ feet; that raising the wheel would reduce the velocity of the fall of the water over the wheel, and would also deprive the defendant of two feet of water in the reservoir which they can now draw out of it.

And the justice found thereon as matter of law : 1. That the plaintiffs are the owners of the seven-acre lot on the north side of the creek, and that their title extends to the center of the creek. 2. That as such owners they are entitled to claim the flow of the water in the bed of the creek along tneir land, to the same extent as it existed at the time of the conveyance to them by Defreest and others. 3. That the defendants are the owners of the reserved acre lying on the south side of the creek, and that their title extends to the center of the creek. 4. That at the time when the defendants diverted the water from the bed of the creek, the same was legally done, because they owned the land on one side and held the lease on the other, and that such diversion was not an adverse possession during the continuance of the lease. 5. That at the various times when the diversion took place, although the same was done under a parol license from the owner of the land, and with knowledge of its permanent character, the acts of the owner did not operate as an estoppel to prevent him from claiming a restoration of the water

after the termination of the lease. 6. That the diversion of the water from the bed of the creek having been made by the defendants in a permanent manner, and being held by them at the time of the conveyance to the plaintiffs, under a claim of right from the parol license of Defreest, the right to the flow of the water through the bed of the creek had ceased to be appurtenant to the seven-acre lot ; and the right to reclaim the same and to compel the restoration of the water to the bed of the creek did not pass to the plaintiffs under those conveyances. 7. That the defendants have acquired no title by adverse possession to the right to divert the water from the bed of the creek. 8. That the proprietors of the land on the north side of the creek have not lost any of their rights by non user of the water. 9. That the acts of the former proprietors of the land on the north side of the creek amount to a relinquishment of their right to use such portion of the waters as were diverted above their land. 10. That where, in consequence of a parol license from the owner of the land on the north side of the creek, the defendants have executed such license in a permanent manner, and at a large expenditure of money, equity will not interfere to enable such owner or his grantees or assigns to violate his parol agreement, but will, on the other hand, enjoin an action at law if brought for such purpose. The justice was therefore of the opinion that the plaintiffs were not entitled to the relief in this action, and that the complaint should be dismissed with costs.

The plaintiffs duly and separately excepted to each and every of the aforesaid findings of fact and of law, so far as they were adverse to them ; and judgment having been perfected on said findings, in favor of the defendants, the plaintiffs appealed therefrom to the general term.

*D. L. Seymour* and *A. J. Parker,* for the plaintiffs (appellants.)

*W. A. Beach,* for the defendants (respondents.)

*By the Court,* HOGEBOOM, J.   The judge who heard this cause on the second trial appears to have arrived at the following conclusions :

1. That the plaintiffs are the owners of the seven-acre lot to the center of the creek on the north side thereof, and are entitled to all the rights and privileges of riparian proprietors, as they existed at the time of the conveyance to them, in 1852.

2. That the defendants are the owners of the one acre lot to the center of the creek on the south side thereof, with like rights and privileges.

3. That the diversion of the waters of the creek by the defendants in 1839, and their continuance of such diversion till the expiration of the lease in 1852, were justifiable and legal acts, and did not constitute an adverse possession nor an estoppel upon the owner of the land during that period of time ; and that the defendants have acquired no right, by adverse possession, to divert the water from the bed of the creek since that time.

4. That the proprietors of the land on the north side of the creek have not lost any of their rights by non user of the water, and consequently have not lost the right to have the waters of the stream restored to the bed of the stream as they were accustomed to flow.

5. That although there was no adverse holding of the water right by the defendants, yet it was by the act of the defendants and with the consent and license of Defreest *permanently separated* from the *land* of the latter, and thereby ceased to be an *appurtenance* to the seven-acre lot, and did not pass to the plaintiffs by the conveyance of the Defreests to them in 1852.

6. That the division having taken place with the parol consent and approbation of Defreest, and for causes operating and expected by him to operate to the benefit of his own property, and having with like consent and approbation been made at large expense and for a permanent object, and expensive improvements of a permanent character with like knowl-

Corning *v.* Troy Iron and Nail Factory.

edge and approbation, having been made by the defendants in consequence of and upon the faith of such diversion, Defreest thereby gave consent and license to such diversion and expenditures, and he and his grantees are estopped from asking the aid of a court of equity to restore the waters to their natural bed, and are on the contrary liable to an action to prevent any interference with the defendants' rights and improvements.

On the questions involved in the foregoing specifications, I think the general term on the hearing had previous to the second trial above mentioned, must be deemed to have held the following propositions :

1. That there was no sufficient evidence of any such consent or acquiescence on the part of the defendants or the plaintiffs, nor to the diversion of the water, or in or to the expenditures and improvements made by the defendants consequent thereon, as would bar their claim to have the waters restored to the bed of the stream ; and no such knowledge or reason to suspect that they were intended to be permanent or perpetual, as would operate as an estoppel upon them.

2. That the plaintiffs having taken from the Defreests an absolute conveyance of the premises in 1852 without reservation, qualification, or limitation, such conveyance must be regarded as passing not only the title to the land and the water, but the water power and the rights and privileges which belonged to the grantors as riparian proprietors.

3. That the circumstances of the case justified a resort to an equitable forum to restrain the defendants from a further diversion of the water, and to compel its restoration to its natural bed or channel ; and that the remedy was open to them notwithstanding the omission of the plaintiffs to appropriate the water power, hitherto, to manufacturing purposes ; notwithstanding the inconsiderable amount of actual damage sustained ; and notwithstanding the heavy expenditures to which the defendants might be subjected if enjoined from the further use of the diverted waters and compelled to restore them to their natural and accustomed channel.

The principles thus enunciated must be regarded as the law of this case until overthrown by a superior tribunal. There is no occasion for their further consideration; and whatever respect we may entertain for the views of the learned judge who determined this case on the second hearing, they must be regarded as overruled, so far as they conflict with the deliberate adjudications of the general term.

Keeping in view these suggestions, let us consider what questions remain open for consideration; and whether in regard to any of them the evidence is sufficiently variant from what it was on the first trial, to justify the application of different rules from those which were heretofore laid down for the determination of the rights of the parties.

The points which the judge at the last hearing deemed open to discussion, and upon the strength of which he decided the case, appear to have been *three*. 1. He held that in consequence of the diversion in 1839 the water right became separated from the land and the estate therein, so that when the Defreests conveyed to the plaintiffs in 1852, although there was no adverse possession and no estoppel, and no loss of the plaintiffs' rights by non user, the conveyance did not pass to the plaintiffs all the rights which the defendants had, and especially did not pass the right to reclaim the water which had been thus diverted, nor the right to demand a restoration of it to its ancient channel. 2. That Defreest in effect consented to the diversion of the water — approved it — anticipated from the expected improvements incidental benefit to his own property; knew or ought to have known that they would be of a permanent character; substantially agreed that they should be made, and is (as well as his grantees) *estopped* from now objecting to them, or from seeking the relief embraced in the complaint. 3. That the appropriate remedy for the injuries sustained or apprehended by the plaintiff is an action for damages, repeated as often as circumstances shall require, and not a suit in equity to prevent the further diver-

Corning *v.* Troy Iron and Nail Factory.

sion of the waters, or to compel their restoration to the bed of the Wynant's kill.

It will be seen that all of these questions were considered and disposed of in the opinion pronounced at general term; and it only remains to determine whether additional evidence has been brought to bear upon the case which should alter the result.

1. The judge at special term seems to have based his opinion that the right to the water did not pass to the plaintiffs by the conveyance from the Defreests in 1852 upon two grounds. (1.) Upon the ground that the water may be considered as at that time held by the defendants under an adverse title and hence protected to the defendants, under that section of the revised statutes which declares a grant of lands void if they are at the time in the actual possession of a person claiming under an adverse title. (1 *R. S.* 739, § 47.) The deed was given on the 23d of July, 1852; the lease under which the defendants had held expired on the 1st of February, 1852; the defendants had six months thereafter to remove buildings and other improvements they had made upon the premises; the defendants had made no open or notorious claim of *adverse* possession, and I think it was at least as reasonable to consider them under the evidence as tenants holding over or persons retaining possession under the title theretofore enjoyed, as to regard them as holding under an adverse title.

But conceding that the defendants might be considered as in the actual and adverse possession of the diverted water flowing over the defendants' lands at the time of the delivery of the deed, it is not so much that body of water as the water subsequently flowing in the stream above and entitled to flow down along the plaintiffs' lands, for which the action was brought, and which the plaintiffs claimed they had a right to compel the defendants to restore. It was the water *right*— the water *privilege*—which the plaintiffs claimed passed by the conveyance, and I think the authorities justified such a

claim. (*Mason* v. *Hill*, 5 *Barn. & Adol.* 1. 2 *Hilliard on Torts,* 113, 114. *Stevens* v. *Stevens*, 11 *Metc.* 251.)

(2.) Upon the ground that the water right or privilege was a mere incident or appurtenance to the grant of the land and by the act of Burden or the defendants became *separated* from the land itself, and therefore would not pass by the conveyance. If this be sound, I do not see how any remedy for the defendants' wrongful act of diversion could ever be practically asserted. It could not be by the plaintiffs, upon the hypothesis assumed; because the right did not pass by the deed. Nor by Defreest, for such a mere incident or appurtenance must pass with the conveyance of the principal or become extinguished. A right of action to recover for damages already sustained prior to the conveyance might well be deemed to remain in the grantor; (*Baldwin* v. *Calkins*, 10 *Wend.* 178;) but a right of action or remedy for future encroachments upon the plaintiffs' rights—for a neglect or refusal to restore the waters of the stream to their accustomed channel—must, I think, necessarily reside in the grantee of the lands. It is this right—the right to have the waters flow in their natural bed—which passed by the conveyance, as a necessary and inseparable accompaniment or incident to the ownership of the adjoining and subjacent soil. This is as absolute and fixed a right arising out of the relations of a riparian proprietor to the waters of the stream flowing over and along his lands, as the right to the soil itself, and is never separated or disconnected from the land until the right itself becomes extinguished by twenty years' adverse possession. It is not like the case of the garden (*Doe ex dem Norton* v. *Webster*, 12 *Adol. & Ellis*, 442) claimed to pass by the word "appurtenances" as an appurtenant to a house, cited by the learned judge at special term; for that was the case of an accidental or casual appurtenance to real estate, which might or might not, according to the actual fact, be enjoyed with it; but *this* is the case of a natural, permanent and inseparable incident or accompaniment to the ownership of the soil, and

incapable of being divested by the act of any wrongdoer until twenty years adverse enjoyment had ripened the original wrong into a legal right.  In the case of the garden it was or was not an appurtenance, according to the fact and the intentions of the parties to the conveyance.  In this case it was an inseparable incident of the ownership of the land—so declared by an inflexible rule of law—and requiring the most unquestionable evidence of the intentions of the parties to the contrary, to justify the inference that it was not designed to be conveyed.  Again; I am not able to see that the learned judge has in any way distinguished the case from what it was, in this particular, when it was before us on the previous occasion; and certainly it does not seem to be distinguished from it, by any new aspect of the evidence.  The question was fully considered and decided in the opinion pronounced at general term, and the question must be regarded as settled, so far as this court is concerned, until our errors (if any) are corrected by a superior tribunal.

2.  The justice at special term further held that the Defreests, and consequently the plaintiffs, though not barred at law, are estopped in equity from enforcing this water right by reason of their knowledge of and acquiescence in the large expenditures and improvements which they saw the defendants originating in 1838 and 1839, and continuing afterwards.  In this I think also the court below erred, (1.) I do not perceive any such preponderating evidence of acquiescence and consent as is inferred by the court, Doubtless Defreest saw the expenditures and improvements in process of being made and did not object to them.  But that he gave his consent and agreement to them in any such unqualified manner as the court decide, is not, I think, a fair inference from the evidence, and is improbable in itself.  Mr. Burden does not speak with great positiveness and strength upon the subject, and he is directly contradicted by Defreest. The legal presumption ought to be decidedly against the probability that a proprietor of land would thus designedly

and gratuitously sacrifice a valuable property right; and I think the consent and agreement ought to be established by the clearest and most satisfactory evidence. I think this doctrine of equitable estoppel has been pushed quite far enough; and there is danger if it be maintained with severity, that many a man without pretensions to legal erudition, or to any thing beyond plain practical sense, will find his property vanishing away before he is aware that it is at all in danger. (2.) Why was Defreest bound to remonstrate against the acts of Burden. Burden having an unexpired lease of thirteen or fourteen years had a perfect right to do what he did. He acted with a perfect knowledge of the nature and extent of his rights, and could lawfully make his expenditures and improvements on as liberal a scale as he chose. Defreest's objections (if he had made any) would probably have been treated by Burden as unfounded, impertinent and perhaps offensive. And it seems to me remarkable that the diversion of the water by the defendants should be presumed to have been intended to be perpetual or permanent, or extending beyond the period of the lease, so as to require a protest on the part of the owner of the land, when the lessee had a perfect right to make them for a limited period, and would be chargeable with a palpable wrong if he designed them to be perpetual. It does not now occur to me that an estoppel can ever arise, founded upon an omission to object to an act, or declaration, when such act was perfectly justifiable or such declaration perfectly true. It is because a party stands silently by and sees an injurious and unwarrantable act done to his property, or hears a false and injurious declaration made affecting his rights, and does not protest against it, that he is regarded as tacitly acquiescing in the propriety of such act or the truth of such declaration, and shall not be permitted thereafter to question it, when such a course would work damage to an innocent party. I do not think the defendants are in a condition to claim the benefit of any such rule. (3.) It is not pretended that any

of the other co-tenants who confessedly had valuable interests in this property ever gave any consent or had any knowledge of the diversion of the water, or of the improvements or expenditures made by the defendants. And I do not think Abraham W. Defreest occupied such relation to them from the mere fact that he collected their rents, (without express authority,) and paid the same over to them, that they ought to be regarded as forfeiting their estate in these premises, on account of *his* individual acquiescence or consent. He was not their general agent; certainly not their agent to sell or to sacrifice these premises. The rights of tenants in common are distinct and not identical, and the acts or admissions of one are not, by virtue of that relation, the acts or admissions of the others. (*Dan* v. *Brown*, 4 *Cowen*, 483.) (4.) This question was also fully considered in the opinion pronounced at general term, on the former argument, and the facts are not essentially different. The former decision must therefore be regarded as conclusive.

3. The remark last made applies, I think, with full force to the plaintiffs' title to the relief sought by the complaint. It was adjudicated when the case was formerly before us. In all its essential features the case is similar if not absolutely identical, and in the light of such authority the views of the trial judge who differs in opinion with the law thus adjudged, are of no moment. But I will briefly examine some of the positions taken by him. (1.) It is said that equity will not grant an injunction if there is an ample remedy at law. I think the rule, according to the modern decisions, is subject to some qualification; but assuming its entire correctness, is it true that here is an ample remedy at law? It is said an action at law lies to recover the damages. Perhaps this may be considered an action at law to recover the damages if it is not sustainable as an equity action; because in the demand of relief there is a distinct claim of damages to the amount of $100, sustained by reason of the diversion of said stream, and under the rule laid down by

the court of appeals in *Marquat* v. *Marquat*, (2 *Kern.* 336,) and *Emery* v. *Pease*, (20 *N. Y. Rep.* 62,) it is not clear that the nonsuit ought not to have been denied on that ground. If an action at law lies to recover the damages, such actions may be indefinitely repeated, and each successive day may witness the commencement of a new one. Which is least burdensome to the defendants, a single action settling the entire right and affording comprehensive relief, or a succession of suits involving the defeated party in heavy costs? So where actions at law are proper to recover damages for waste or trespass upon lands, it has been repeatedly held that courts will interfere by injunction to restrain acts of that character. (*Livingston* v. *Livingston*, 6 *John. Ch.* 497. *Spear* v. *Cutler*, 2 *Code R.* 100.)

It has been held in a case between these very parties that an injunction will issue to prevent the *obstruction* of water courses. (*Corning* v. *Troy Iron and Nail Factory*, 6 *How. Pr. Rep.* 89.) Nor is it entirely clear to my mind that an action at law for damages, if successful, would prevent the wrongful act of diversion from ripening into a perfect legal right. It would establish, it is true, the fact of wrongful diversion, but it would still leave the act of diversion in full force, and would not restore the waters to their ancient channel, nor interrupt the adverse occupancy of the defendants. So an action or actions at law for continued trespasses might be successfully prosecuted against a wrongdoer, who takes and holds possession of the land of another; but they would not interrupt the adverse possession, though decisive of the legal right. And it may be doubted whether the legal effect of the adverse possession would not still continue, and after the lapse of twenty years ripen into a perfect right. (2.) The question is discussed by the learned judge at special term whether *special* damages are not necessary to be averred in order to entitle a party to an injunction, but on the whole concluded to be unnecessary. Such is, I think, the course of decision in this state. But the complaint contains probably a suffi-

cient averment of special damage (if that were necessary) when it states that by the unlawful acts of the defendants "the volume of water is diminished," "its hydraulic power destroyed or impaired to such a degree as to render it utterly insufficient and worthless," and "the plaintiffs' premises injured and their value destroyed." (3.) Again, it is said the plaintiffs' title must be clear. It is clear, and upon the evidence unquestionable. (4.) Finally, it is said that where the damage to the defendant by the injunction will be very great and no good result from it to the plaintiffs, beyond establishing a title, an injuction will not issue. I think the rule is thus too broadly stated, but to prevent an injunction both these circumstances must concur; and here they do not concur. When the case was before presented we held that "the resort to an equitable forum seems consonant to the established practice in cases of this description, makes the relief final and comprehensive, avoids a multiplicity of suits, and is equally effective with an action at law in preventing the adverse possession of the defendants from ripening into a hostile and perfect title." (*Corning* v. *The Troy Iron and Nail Factory*, 34 *Barb.* 492, 493.) To those views we still adhere, and we regard them as sustained by principle and the weight of authority. This question is largely considered and ably presented by the late Justice Story, in *Webb* v. *The Portland Manufacturing Co.*, (3 *Sumner*, 183.) The suit was in equity, seeking by injunction to prevent the defendant from diverting a water course. He holds that where there is a clear violation of a right, actual damage is not necessary to be shown *in an action of this sort*. Nominal damages will at all events be awarded, and especially "whenever the act done is of such a nature as that by its repetition or *continuance* it may become the foundation or evidence of an adverse right." He adds, "I know of no more fit case for the interposition of a court of equity, by way of an injunction, to restrain the defendant from such an injurious act. If there be a remedy for the plaintiffs at law, still that rem-

edy is inadequate to prevent and redress the mischief." It is held as proper ground for the interference of a court of equity in cases of this description, that it will prevent a multiplicity of suits. (*Angell on Water Courses*, §§ 449, 450. *Story's Eq. Jur.* § 901.) Again, it is said, "cases of a nature calling for the like remedial interposition of courts of equity are the obstruction of water courses, the diversion of streams from mills, &c." (2 *Story's Eq. Jur.* 241, *notes* 1, 2. § 928, *p.* 243.)

I do not deem it necessary to consider the question of the trivial damages hitherto sustained by the plaintiffs, the expensive improvements made by the defendants, and the large expenditures which will be necessary to restore the diverted waters to their ancient channel, in case the plaintiffs' action is sustained. They were all fully considered in the former decision, (*Corning* v. *Troy Iron and Nail Factory*, 34 *Barb.* 492,) and need not be here repeated. I think the expenditures necessary to restore the waters to the bed of the stream will not be so great as apprehended, and the defendants can be protected from unnecessary damage by allowing them one year, as before, to effect the restoration of the water, and adapt their works to the new condition of things.

It would have been better, in my opinion, if the parties, after the former adjudication, had put the case in a shape to have our decision reviewed by the court of appeals without further litigation and expense; but as they have not chosen to do so they must abide the issue.

In my opinion the judgment of the circuit and special term should be reversed and a new trial granted, with costs to abide the event.

[ALBANY GENERAL TERM, December 1, 1862. *Hogeboom, Peckham* and *Miller,* Justices.]