Bradford for the appellants. The proceeding of the city upon due consideration would be found to resolve itself into an illegal and unconstitutional attempt to compel the complainants below to bear the expense of abating a gross nuisance on their lands, for which the city was responsible, and which it wrongfully permitted to continue for many years. The depositions in the case show that John Montgomery, many years prior to the construction of the Monroe street culvert, reaped substantial benefit from the cultivation of his portion of the lands assessed and referred to in the bill of complaint, and a number of years before the construction of the culvert a nuisance was created upon said lands, whereby he and his heirs after his death were deprived of the benefit therefore derived from them; and the health and comfort of all persons residing in their vicinity were seriously endangered and affected by it. The nuisance resulted from the pollution of the waters of Shipley Run, a small natural watercourse, by the refuse matter cast into them from slaughterhouses and manufacturing establishments along the course of it *Page 110 
and the flooding of the said lands with the waters of it they polluted, and their absorption into the soil. And such pollution and flooding was continued in a great measure, if not entirely through a dereliction of duty on the part of the city, for it possessed ample power under its charter to prevent it, and had passed an ordinance for that purpose, but never enforced it. And it was also not the right but the duty of the city to keep the culvert across Front street open and free from obstruction. Yet it failed to do that also, and could have been held liable for any damage resulting to the said lands by reason of its failure to do it. Parker v. City of Lowell, 11 Gray, 353; Perry et al. v. City of Worcester, 6 Gray, 544; Dill on Mun. Cor., §§ 778, 797. And even upon the assumption that such flooding was caused by the filling up of the bed of Shipley Run or its obstruction at a point below the lands in question, the city was no less at fault, because it was its duty to keep said water-course open, clear and unobstructed. Rev. Code, 443; City Ordinances, 278. Nor was there the excuse of ignorance here, for if the answer of the respondents is to be believed, the attention of the city council was drawn to the matter by John Montgomery years before the construction of the Monroe street culvert. This nuisance had thus, through the fault of the city, continued unabated, and increasing for years when the petition to the city council, mentioned in the pleadings was presented for the abatement of it, in pursuance of which the city constructed the culvert with the intention and for the purpose of changing the course and direction of Shipley Run, and diverting it from the lands of the complainants into the bed of Monroe street. It may or may not also have intended that it should serve as an ordinary street sewer. But that question would be found to be perfectly immaterial in the case. It is, however, proved and cannot be disputed that the main object and purpose of the sewer was to change the natural course and direction of Shipley Run.
But at that time the city had no power under its charter to construct a culvert for the alteration of the course and direction of it, as it was a natural and perennial stream. The corporate *Page 111 
powers of municipalities are to be strictly construed, and any act or proceeding by a city, not clearly warranted by its charter, is illegal and void. Dill, on Mun. Cor., § 55. The only provision of its charter which then authorized the opening and construction of gutters, drains, sewers, etc., and the laying of a special assessment on lands particularly benefited thereby, to defray the expenses thereof, was the act of January 30, 1866, Rev. Code, 443; for the act for altering and changing the course and direction of natural streams within the limits of the city was not passed until April 10, 1873, Rev. Code, 444, which was a considerable time after the construction of the culvert in question and the diversion of that stream into it. A corporate power of a city to make a local improvement does not confer or imply the power to lay a special assessment upon property benefited to pay for it. Such an assessment can be laid only where the power to do so is plainly conferred and strictly followed. City of Philadelphia v.
Tryon, 35 Pa., 401; City of Philadelphia v. Greble,38 Pa., 339; Borough of Mauch Chunk v. Shortz, 61 Pa., 399; Wrightv. Chicago, 20 Ill., 252; Columbia v. Hunt, 5 Rich., 550; Chicago v. Wright, 32 Ill., 192; Annapolis v.
Harwood, 32 Md., 471; Fairfield v. Ratcliff, 20 Iowa, 396; Dill, on Mun. Cor., § 596. Assuming therefore for the sake of argument that the city had the legal right to change the course of that stream at the time of the construction of the Monroe Street culvert, the assessment in question could not be supported, unless the construction of the culvert for that purpose came within the provisions of the act of 1866, which alone authorized the laying of a special assessment. The diversion of the stream through the construction of the culvert did not come within the provisions of the act of 1866, which, for the purposes of this argument, might be divided into two parts: first, the grant of jurisdiction to the city council over the drainage of the city; second, the grant of power to the city council to exercise that jurisdiction in the mode mentioned in the act, which mode measures the extent of that power. Zottman's Case, 20 Cal., 102; Dill, on Mun. Cor., § 610. The following words of the act, "The city council shall have the entire jurisdiction and control *Page 112 
within the limits of said city of the drainage thereof," merely confer such jurisdiction and control upon the city council in contradistinction to any other set of municipal officers, but do not either define or measure the extent of the power over the drainage of it. But the power given under that act to lay a. special assessment to defray the expenses of drainage did include or confer the power to alter the course of a natural stream.
A man has no right of property in the flow of mere surface water upon or over his land, but he has a legal right of property in the flow of a natural un-navigable stream in its accustomed course over his land, which right is inseparably connected with, and to all intents and purposes is to be considered as part of the freehold; and such right exists in full force, although such stream may be of diminutive size. Earl v. DeHart, 1 Beasley's Ch., 280; Gillet v.
Johnson, 30 Conn., 180; Wheatley v. Baugh, 25 Pa., 528; Arnoldv. Foot, 12 Wend., 330; Luther v. Winnisiment Company, 9 Cush., 171. And if such right be violated, either by the diversion of the stream from a man's land, or by other unwarrantable interference, an action may be sustained even without proof of actual damage. Bolivar Manuf. Co. v. Neponset Manuf. Co., 16 Pick., 241; Hastings v. Livermore et al., 7 Gray, 194; Ang. on Water-courses, § 427, 432. And an injunction will be awarded to prevent the wrongful diversion of a natural stream from a man's land, although it does not appear that actual damage would result from the diversion. Webb v Portland Manuf. Co., 3 Summer, 189; Corningv. Troy Iron and Nail Factory, 39 Barb., 311; Ang. on Water-courses, § 449. A natural stream, therefore, cannot lawfully be diverted from its accustomed course over a man's land without his consent, except through an exercise of the right of eminent domain. Ang. cm Water-courses, §§ 8, 97, 457; Delancy et al. v.
Boston, 2 Harr., 489. And the right of eminent domain must be clearly granted to a municipal corporation before the courts will recognize its exercise by such a corporation. Dill, on Mun. Cor., §§ 467, 468, 469; Cool. Con. Lim., 530; Thatcher et al. v. Dartmouth Bridge Co., 18 Pick. 501. This right clearly would not *Page 113 
have been conferred upon the city with respect to natural streams under the act of 1866, even had that act given the city a general control over drainage without any limitation to prescribed methods. Doubtless the diversion of natural streams may often tend to promote thorough sewerage, but not being drainage or sewerage per se, and involving the divesting of vested rights of property, the power to divert such streams must be clearly conferred upon municipalities by appropriate legislative enactments before it can be legally exercised. Many cities have had this power conferred upon them; and the city of Wilmington is now vested with the power, but it was not until the act of 1873 was passed, and long after the construction of the Monroe street culvert and the diversion of Shipley Run into it was made, that the city acquired it; and that act is purely prospective. Even upon the supposition that the act of 1866 had wholly omitted to provide the mode in which the control over drainage was to be exercised, it clearly appears that the city would not under its charter have had the legal power to divert the stream at the time the culvert was constructed, but when all the provisions of that act are construed together, afortiori, it appears that the city did not possess that power.
The mode in which, under the act of 1866, the control over drainage was to be exercised (and which mode must have been observed in order that a valid special assessment might have been laid) clearly excludes the power claimed in the answer. The maxim expression unius exclusionest alterius here aptly applies. I submit that the act of 1866, properly construed, would read substantially as follows: "The City Council shall have the entire jurisdiction and control within the limits of said city of the drainage thereof, and may pass ordinances for the opening of gutters, drains and sewers within the limits thereof, and for the regulating and maintaining and cleansing of the same, and keeping the same open, clear and unobstructed, and for the regulating and maintaining, cleansing and keeping open, clear and unobstructed the natural water-courses, runs and rivulets within the said limits," etc. The mode prescribed for the exercise of the power, and which, as I have before shown, measures the extent *Page 114 
of the power, extends only to drainage and sewerage proper, and certainly cannot be more comprehensive than the mode in which, under a general power of drainage without specification of any mode, the city could exercise that power. But the argument does not stop here. The contemporaneous exposition of that act, as shown by acts, declarations and usage, is utterly opposed to the existence of such a power under it, which appears by the provisions of the general ordinance passed by the city council in persuance of it, by the fact that no such power appears to have been exercised or claimed in any other instance, and by the application on behalf of the city to the Legislature to enact the law of 1873. It therefore clearly appears, I contend, that neither under the act of 1866, or any other provision of its charter, that the city did not possess the legal power to divert the stream in question from its natural course when it was done, and that in constructing the culvert mentioned for that purpose, it constructed it for an unauthorized, or in other words, for an illegal purpose.
The special assessment in question was made for a work which was intended to, and which did answer an illegal purpose, and that assessment is entire and indivisible; and where a tax or assessment is laid partly for a legal and partly for an illegal purpose, and such tax or assessment is entire and indivisible, the whole tax or assessment is illegal and void. Bangs v. Snow, ct al., 1 Mass, 181; Stetson v. Kempton et al., 13 Mass, 272; Libbyv. Burnham, 15 Mass., 144; Alvord v. Collin, 20 Pick., 418; Torrey v. Millbury, 21 Pick., 64; Wellsv. Burbank, 17 N.H., 393; Elwell v. Shaw, 1 Greenl., 335; Jogner v. Third School District in Egremont, 4 Cush., 567. But even upon the assumption that the construction of the Monroe street culvert as aforesaid came under the provisions of the act of 1866, the assessment laid for the expense of it is illegal and void. A law depriving a man of his private property without his consent and without providing a tribunal for the assessment of his damages, is unconstitutional and void. Perry v. Wilson, 7 Mass., 393; Callender v. Marsh, 1 Pick., 418; Gardner v. Village of New-burgh, 2 Johns. Ch., 162; Bloodgood v. Mohawk and Hudson Railroad Co., 18 Wend., 9; Fletcher v. Auburn and Syracuse *Page 115 
Railroad Co., 25 Wend., 462; People v. Hayden, 6 Hill, 359; Beekman v. S. S.R.R. Co., 3 Paige, 45; Smithv. Helmer, 7 Barb., 416; Whiteman's Exr. v. W. S.R.R. Co., 2 Harr., 514; 2 Kent's Com., 339; Cool. Con. Lim., 560; Dill, on Mun. Cor., §§ 480, 482. So a dam across a natural stream, although creating a nuisance, cannot be destroyed without compensation to the owner provided by law, as it would be an exercise of the right of eminent domain. Miller v. Craig, 3 Stockt. Ch., 175.
It consequently follows that the right of the city, as against the complainants or those with whom they are in privity, if any it had, to construct said culvert as aforesaid, must have rested either on some other provision of its charter than the act of 1866, or upon the consent of the complainants or those with whom they are in privity. But if it rested on any other provision of its charter than that act, then the assessment in question is illegal and void, because no other provision of its charter authorized the laying of a special assessment in such a case. In that case the city must defray the expense of constructing the culvert out of the fund produced by the general city taxation; but if, on the other hand, that right rested upon the consent of the complainants or those with whom they are in privity, the law of consent, and not the provisions of the charter, must govern their rights and liabilities in the case. Consensus facit legem, but that law is coextensive only with the consent given, and the construction of the culvert not coming under the provisions of the act of 1866, that consent, if any had been given to it, could not have brought it within the provisions of that act, which alone provided for the laying of any special assessment. But no consent to the laying of that assessment was ever given, directly or indirectly, by any of them. Consent was given, it was true, by Alexander Montgomery, one of the heirs of John Montgomery, and by Aziriah H. Quinby and William A. Murphy, the husbands of two other heirs of his, to its construction, which, however, was solely evidenced by their becoming parties to the petition to the city council, dated June 4, 1870, and which extended merely to the construction of the culvert as aforesaid, but not to the laying of a special assessment for it. *Page 116 
And yet, such consent by Quinby and Murphy could not bind the interests of their respective wives in the lands, as heirsof John Montgomery, liable to the assessment in question, under the act for the benefit of married women, passed March 17, 1865, Rev. Code, 478, which exempted their interests therein from the alienation or disposition of their husbands. And Alexander Montgomery, at the date of the petition, as one of his heirs, was entitled to only an undivided interest therein, which, together with the undivided interests of his coparceners, was subsequently sold and conveyed in the summer of 1873, and before the entry of assessment in question in the lien book of the city, in fee simple and severalty to a number of purchasers in unequal portions. Then even supposing that the signing of the petition by all three of them, when sui generis would, as evidence of consent, have been sufficient to subject the lands to the payment of the special assessment for the construction of the culvert, the assessment is illegal and void, even as to the interest of Alexander Montgomery and his grantees therein for the assessment, which the warrant to sell the lands should and does follow, purports to be against the estate of John Montgomery, and not merely against the interest of Alexander Montgomery or his grantee therein. Such assessment is therefore too extensive, must be enforced wholly or not at all, and is illegal and void; and the lands having been so sold and conveyed prior to the entry of the assessment in the lien book of the city, they never, as will more fully be shown hereafter, become subject to any lien by reason of the entry of the assessment in it.
But even if the city had the legal power under its charter to construct the culvert for the purpose aforesaid, and to lay a special assessment for it, the assessment in question is illegal and void. The act of 1866 authorizes the city to prescribe by general regulations the mode in which the control over drainage conferred by it should be exercised, who should bear the expense of such drainage and also the mode of collecting the assessments for it; and in pursuance thereof, the city council, in June, 1866, passed a general regulation or ordinance, and which is the only general one that has been passed in pursuance of it. City Ordinances, *Page 117 
278. And the provisions of that ordinance must therefore determine the legality or illegality of the assessment in question, because the mode prescribed for laying such assessments must be strictly followed or they will be illegal and void. Dill, on Mun. Cor., § 610. But that ordinance provides that the street commissioner shall report to the city council an estimate of the value of the lands upon which the expense of making the improvements contemplated by the act of 1866 ought to be assessed; such estimate of value to be made independently of any buildings or improvements upon such lands. Nevertheless, no such estimate in the case before the court was ever made or reported to the city council; and it is so specifically charged in the bill of complaint, as to the truth of which the answer is silent, although the charge relates to a matter peculiarly within the knowledge of the city council, and is therefore to be taken as admitted to be true, and as a negative averment in the bill of complaint in relation to such a matter must be taken to be true, unless disproved by that party. 2 Dan. Ch. PL and Pr., 834, note 3; 1 Greenl. Ev., § 79; 1 Phill. on Ev., 495. Nor will the presumption of innocence nor of the regularity of official proceedings relieve the party from the operation of this rule. 1 Phill. on Ev., 446; Brunswick v. McKean, 4 Greenl., 508; Williams v. Peyton's Lessee, 4 Wheat., 77; Earlyv. Doe, 16 How., 610. And the provision of the ordinance for such an estimate is mandatory, as contradistinguished from being directory merely. Cool Con. Lim., 77. The assessment is therefore illegal and void. Zach. v. Penna. R.R. Co., 25 Pa., 394; Rathbun v. Acker, 18 Barb., 393; Dill, on Mun. Cor., § 610. It also lacks certainty to a fatal extent both as to the land which the city had been enjoined from selling under the prayer of the bill, and as to the persons owning the land at the time the assessment was made and entered in the lien book. The act of 1866 provides that the city may prescribe who shall bear the expense of the drainage thereby authorized, and that it may assess such expense upon the persons and property, real and personal, of those particularly benefited thereby, or of those owning or holding lands through or along which such sewers, drains or watercourses *Page 118 
shall flow or pass; but the general ordinance before referred to goes further and provides for an assessment mentioning particularly the names of the owners or reputed owners or possessors, when known, of each lot assessed and the particular land or premises on account of the ownership or reputed ownership or possession of which they are or shall be respectively assessed, and if the names of any of the owners be unknown, then the assessment shall be generally against the lot or premises by particular or general description and the owners or reputed owners or possessors by such general designation. So far as it provides for assessments against reputed owners of land or property in the locality referred to, it transcends the authority conferred upon the city by that act, and is illegal and void to that extent. Dill, on Mun. Cor., § 55; Corporation of Washington v. Pratt, 8 Wheat., 681. But the assessment in question is in terms against the "estate of John Montgomery" which had been sold and conveyed, as previously stated, before the assessment was laid and entered in the lien book, which makes the argument against the legality of it still stronger. Whitneyet al. v. Thomas, 23 N.Y., 281; State v. Hardin, Collector 5 Vroom, 79. There is also a fatal lack of certainty in the description of the lands, for the assessment is indefinite as to the quantum of land to be covered by it, while the expense of constructing the culvert is thereby apportioned among these particular owners of land, not upon the basis of local benefit received, but on that of frontage alone. The act, however, authorizing the laying of a special assessment on owners particularly benefited by the construction of the culvert, contemplates an apportionment of it among them upon the basis of local benefit received, and upon any other supposition the act would be unconstitutional and void. Hammet v. Philadelphia,65 Pa., 146; Washington Avenue, 69 Pa., 352; State v. City of Hudson, 5 Dutch., 104; State v. Town of Bergen, 5 Dutch., 266; Statev. Gardner et al., 5 Vroom, 327; Clapp et al. v.
City of Hartford, 35 Conn., 66.
But it is claimed in the answer that John Montgomery frequently urged upon the city council the construction of the Monroe street culvert as aforesaid, and admitting for the sake *Page 119 
of argument that the allegation is true, no estoppel against the complainants could arise from it, for no action was taken or omitted by the city in consequence of it in his lifetime, or, indeed, at any time, and after his death any estoppel must have been based upon the acts, conduct or declarations of the then owners of the lands. It appears that the culvert elbow at Second and Monroe streets was constructed by the city in 1866 upon his application but it also appears that the city was fully paid for that by his conveyance to it of the bed of Monroe street between Front and Second streets. There is nothing in these or in any other act alleged and relied on in the answer for the purpose, to constitute an equitable estoppel against the appellants or to prevent them from contesting or denying the validity of the assessment in question. Bank of Wilmington and Brandywine v. Wollaston, 3 Harr., 90; Eldred v. Hazlett's Administrators, 33
Pa., 307; Welland Canal Co. v. Hathaway, 8 Wend., 480; Dezellv. Odell, 3 Hill, 215; Truscott v. Davis et al.,
4 Barb., 495; Martin v. Angell, 7 Barb., 407; Otisv. Sill, 8 Barb., 102; Am. Note to Doe v. Oliver, 2 Smith's Ld. Ca., 568; Lounsbury v. Depew, 28 Barb., 44; Kinneyv. Farnsworth, 17 Conn., 355.
It is claimed that the lands were greatly enhanced in value by the construction of the culvert, and sold in 1873, for a much higher price by reason of it, but that was not true and the evidence shows it. If, however, it were true the appellants would not be equitably estopped from contesting the validity of the assessment. It should also be borne in mind that if it was true, the appellants who are now the owners of the lands, have paid that increased price for them. It is also claimed that at the sale of them, William Bright, as the duly authorized agent of the heirs of John Montgomery, publicly declared that the expense of constructing the culvert would be retained out of the proceeds of the sale, and that the purchasers of them would take them clear of all liens and incumbrances. If such a declaration were made and the money were so retained by him, still the appellants would not be equitably estopped from contesting the assessment, for it was not made until after the city had taken *Page 120 
action in the matter and completed the culvert; and therefore it could not furnish the basis of an equitable estoppel. But his testimony shows that he did not make any such declaration, and although he retained for a considerable time out of the proceeds of the sale a sum of money equal to the amount of the assessment, that it was not done by him because the heirs of John Montgomery recognized any right in the city to lay a special assessment to defray the expense of constructing the culvert, for they always denied the existence of any such right; but it was done merely for the purpose of protecting the purchasers of the lands against any injury which might acrcue to it by reason of the construction of the culvert; and is per se conclusive evidence under the circumstances of the case that the heirs denied the legality of such assessment, and furnishes no basis whatever for an equitable estoppel.
But he would go further and contend upon the equities disclosed in the case, so far as an equitable estoppel can be conceived to exist, such estoppel should preclude the city from denying the invalidity of such assessment. It is claimed in the answer that John Montgomery frequently urged upon the city council the construction of the sewer for the purpose of abating the nuisance upon his land, and it appears that he conveyed to the city the bed of Monroe street between Front and Second streets on which valuations have been placed by the witnesses ranging from six hundred to fourteen hundred dollars, and in the answer it is claimed that the sole consideration for it was the culvert elbow at Front and Second streets, the bill for which made out against him was two hundred and fifty-six dollars. This latter claim was simply absurd, because the elbow of itself neither did nor was it calculated to abate the nuisance in the least degree. The reasonable and well-nigh unavoidable inference to be drawn from the facts is that the city in consideration of the conveyance was to construct, at its own expense, the Monroe street culvert, and the inference is rendered irresistible in view of the fact that the elbow was so constructed as to be exactly adapted to the connection of the culvert with it; and if such was the case, then he conveyed it on the faith of the undertaking *Page 121 
by the city to build the culvert at its own expense, and is thereby equitably estopped from disputing the injustice and invalidity of the assessment. And this conclusion was confirmed by the fact proved that the culvert was not constructed so as to effect the important end of cellar drainage. A careful examination of the facts disclosed in the case shows that the proceeding of the city to enforce the assessment in question is an illegal and unconstitutional attempt to compel the appellants to bear the expense of abating a gross nuisance on their lands, for which the city was responsible, and which it wrongfully permitted for many years to continue.
But aside from all the grounds of defence heretofore urged, it is manifest that the city should not be permitted by a court of equity to punish the appellants in this case for its own dereliction of duty. A leading case directly in point is that of Weeks v. Milwaukee,10 Wis., 242; the court says, "I am also of the opinion that the tax assessed against the plaintiff's lots to abate a nuisance which, it appears, was created entirely by the act of the city in so constructing a street as to cause the water to flow and remain upon the lots which it would not otherwise have done, is illegal. I cannot recognize the right of a corporation to create a nuisance on the lot of an individual. But to create the nuisance, and then tax him to abate it, is a double wrong. I shall not attempt any examination of the question upon authority, but I am satisfied such a right cannot be sustained. I think this conclusion results from the reasoning of Mr. Justice Smith in Goodall v. Milwaukee, 5 Wis., 32, which I fully approve. And until I am prepared to say that private rights must yield, even to the extent of total destruction, rather than place any impediment in the way of whatever proceedings corporations may see fit to take, I cannot say that a city may create a nuisance on the lot of a citizen without making him any compensation for the damage, and then tax him to abate it."
The jurisdiction of the Court of Chancery to grant the relief prayed for in the case is indisputable. Dows v. City of Chicago 11 Wall., 108; Commonwealth v. Supervisors of Colley Township,29 Pa., 121; Miller et al. v. Gorman et al.,38 Pa., 309; *Page 122 
Barr v. Denniston, 19 N.H., 170; Morris Canal and Banking Co.v. Jersey City, 1 Beasl. Ch., 227; Hoagland et al. v.
Township of Delaware, 2 C.E. Green's Ch., 106; Frewin v.
Lewis, 4 Mylne Cr. 249; 2 Story's Eq. Jur., § 955; Dill. on Mun. Cor., §§ 727 to 738; High on Injunc., 504, 509.
Macallister for the respondents. A careful consideration of the powers conferred upon the city by the several acts of the legislature passed for that purpose, and the ordinances adopted in pursuance of them will remove any doubts that may exist as to the legality and validity of the action of it in constructing the sewer in Monroe street, the turning of the waters of Shipley Run into it, and the assessment against the persons owning lands adjoining. The powers conferred on the then borough by its charter of 1809, and which have continued in force ever since, are full and adequate, one of the provisions of which is in the following terms: "And in general shall have power to do all those matters and things for the well-being of the said borough which shall not be in contravention of any existing laws of this State or the constitution thereof." By that act the powers, rights and jurisdiction granted to it by its former charter were confirmed in section 24 of it, and it was further declared that every matter and thing therein contained should be construed and taken most favorably and beneficially for the corporation. 4 Del. Laws, chap. 97, §§ 11, 25, 28. And these powers and provisions have been preserved in force and confirmed by the legislature up to the present time.8 Del. Laws, chap. 108, §§ 8, 13, 32; Rev. Code of 1852, chap. 73, §§ 28, 100; Rev. Code of 1874, chap. 73, §§ 27, 99, 100. Among the necessary powers of a municipal corporation is that of constructing drains and sewers, and generally to supervise and regulate its drainage, but independent of the authority given the city in the general powers conferred upon it to regulate its drainage, construct sewers, to repair and keep in order its streets, or make regulations for the public health, would be sufficient special grant to authorize it to construct drains and sewers and to regulate their use. 2 Dill. Mun. Cor., §§ 644, 645, 544, note 1; Fisher v. Harrisburg, 2 *Page 123 
Grant. Ca., 291; Cone v. Hartford, 28 Conn., 363; Boroughv. Shortz, 61 Pa., 399; Stroud v. Philadelphia,61 Pa., 255; State v. Jersey City, 1 Vroom, 148.
It is in evidence that Shipley Run drained a large part of the western portion of the city, carrying off refuse matter from factories, etc. Its waters have never been used for drinking, or been available for manufacturing purposes, and certainly not since 1852, for cultivation in any manner. It was a very small natural stream, useful for drainage only. There can be no doubt that under the general powers conferred upon the city to do all those matters and things for the well-being of the city, etc., that it had the power to construct the sewer or culvert in question, and to turn the filthy waters of the run into it. And such was the opinion of the Chancellor on the hearing of the case before him. The diversion of it was for the purpose of promoting a more thorough drainage and sewerage of that part of the city, and under the powers conferred it had the right to improve the character and condition of it to render it more effectual for that purpose. It is claimed that this right and power has existed at least since 1809. It has, however, been plainly conferred by subsequent acts of the legislature. 11 Del. Laws, 181 passed in 1855, to keep open drains, etc.; 13 Del. Laws, chap. 34, § 1, passed in 1866; Rev. Code, chap. 73, § 99; 14 Del. Laws, 580, passed April 10th, 1873. The act to regulate the building of wharves in the city passed in 1855, before cited, provides that nothing that act contained should be construed to prevent the City Council from constructing and providing proper sluices, culverts and waste-ways for the drainage of the city, or to prevent the present drains from being emptied into the Christiana River. The act of 1866, also before cited, gives the city the entire jurisdiction and control within its limits of the drainage of it; but the more immediate object of its passage was to give the power of assessing in their discretion the expenses thereof against the owners of real or personal property particularly benefitted by such drainage. Section 100 of the city charter provides that it shall be construed most favorably and beneficially for the city. The act of 1873 giving the right to *Page 124 
alter the course and direction of streams, is merely declaratory as to that matter. The object of it is to confer on the city the right of eminent domain, and to provide a mode of procedure and compensation to the owners when their lands are to be taken for the purpose. The authority to assess the costs of such construction and drainage, as before stated, is, however, expressly given by the act of 1866, while the mode of collecting it is prescribed by City Ordinance, 278.
Only one-half of the cost of constructing the culvert was assessed against the land-owners particularly benefited by it, the balance being met by the taxation of the whole city, although the whole of it might have been assessed against the former exclusively, in the discretion of the City Council. But the proof in the case is, that John Montgomery desired and petitioned the City Council that the culvert should be made for that purpose, and that all the then owners of the land in question consented to the construction of it and the diversion of Shipley Run into it. No protest or remonstrance ever came from any of the heirs of John Montgomery against it, and all the landholders to be affected by it will be presumed to have known that the city had the right inder the act of 1866, to make the assessment against them for the cost of constructing it. The courts in other States have held that petitions to city councils for public improvements which they have authority under their city charters to make, must be taken to ask that it may be done under their charters, and if they turn out to be invalid, the petitioners are estopped to set up that invalidity as a ground for equitable relief against the action which they had requested. 2 Dillon, 840; Motz v. Detroit, 18 Mich., 495, 528; Lafayettev. Fowler, 34 Ind., 140; Sleeper v. Ballon,6 Kan., 300. The appellants are equitably estopped from denying the legality of the acts of the city, or its right to lay and collect the assessments. An estoppel in pais, or an equitable estoppel, is where there has been an admission intended to influence the conduct of the person with whom the party is dealing, and leading him to do that which must be prejudicial to his interests, unless the party estopped be cut off from the power of retraction. To constitute such an estoppel, there must be, first, *Page 125 
an admission inconsistent with the evidence which he has proposed to give, or the title or claim which he proposes to set up; secondly, an act done by the other party upon the faith of such admission; and thirdly, an injury to him by allowing the admission to be disproved. Dazell v. Odell, 3 Hill, 219; Dutchess of Kingston's Case, 2 Smith's Ld. Ca., 712. And the principle on which it is founded is, that it would be against good conscience and honest dealing to obtain such unfair advantage, and the rule assumes that the other party has been influenced in his conduct and injured by it. Bank of Wilmington and Brandywine v. Wollaston, 3 Harr., 95. It cannot be denied, that the City Council was directly influenced by the petition signed by some of the appellants to construct the culvert and turn the waters of Shipley Run into it, at a great cost, for the particular benefit of those holding lands through which it flowed; and such of them as did not sign the petition were privies with notice, and made no objection to its being done; on the contrary they all desired it. And it is in proof that all of the appellants, when they became owners of the lands in question, were aware of the city's claim, and the assessment for the improvement, and purchased the property with the understanding between them and Mr. Bright, the agent of the heirs of John Montgomery, for the sale of it, that a sufficient sum should be retained by him out of the proceeds of the sale to pay the assessment; and which was accordingly retained by him. The benefit accruing to these heirs from this improvement is estimated by some of the witnesses as high as three thousand dollars.
But the conclusive effect of an estoppel embraces privies as well as parties, and includes every one who deduces right or title from the person originally bound by it, and the rule is the same whether it relates to real or personal property. Doe v. Oliver, 2 Smith's Ld. Ca., 728; McCrary v. Robinson, 19 Ala., 430; Woolleyv. Edson, 35 Ver., 214; Corbet v. Norcross,35 N.H., 99; Snodgrass v. Picketts, 13 Cal., 359; Simmon's Lesseev. Hendrickson, 3 Harr., 103; Potts v. Dowdall, 3 Houst., 369; Betts et al. v. Deputy et al., 3 Houst., 574; Schoen v. McComb et al., 4 Houst., 213. However, the culvert having been constructed *Page 126 
for the purpose of improving the drainage of the city, as drainage per se (the proof showing that Shipley Run was of no other utility than drainage solely), the consent of the owners of the lands adjoining to, either the construction of the one, or the diversion of the other, was not necessary to authorize or empower the city to do it, and could have no other effect than to estopp them from claiming any damages which they might have sustained by it. The city has repeatedly exercised its right of diverting the run for such a purpose. The course of it formerly was across the northwest corner of Second and Monroe streets, which has been built up for many years; and it was again done when the elbow was constructed at Second and Monroe, and John Montgomery paid the cost of the work by conveying to the city the bed of the latter street.
There was no occasion in this case for the exercise of the right of eminent domain, as the persons over whose lands the polluted waters of the run passed were willing and anxious, for obvious reasons, to have them diverted into the culvert. It was only when it appeared that in order to properly improve the drainage of the city by means of the run it would be necessary to straighten its course and directions, and consequently to take lands from the owners of them that the legislature was asked to give the authority to take such land as might be needed for that purpose on making proper compensation, and the act of April 10, 1873, was passed. But there is no testimony, nor does it appear in this case that the city has taken or attempted to take the private propery of any of the appellants or of the heirs of John Montgomery without compensation or otherwise. The stream was nothing but a nuisance to them at the time the culvert was built, and to abate that the diversion of its waters was made into it.
Lot No. 1, specially referred to in the bill of complaint as having been long ruined by the gross neglect of the city for the want of drainage caused by the construction of the culvert, happened to be soon banked in by the grading of surrounding streets, and formed a basin, and the receptacle not only of the overflow from Shipley Run, but of the surface water from the neighborhood, and if, as is claimed, it became a nuisance upon the *Page 127 
lot, it was the duty of John Montgomery and his heirs to abate it, for it was their duty under the law to conform to the grade of the streets, or to use any other means to prevent it. Clark v. City of Wilmington, 5 Harr. 243; Magarity v. City of Wilmington, 5 Houst.
There is no proof that any mode of procedure required by law in the construction of culverts and the assessment of costs, had not been followed and complied with, but even if it were proved that one or more preliminary steps or acts had been omitted, or had not been properly performed as prescribed by law, such omission or improper performance would not have warranted a court of equity in interfering, even by a preliminary injunction, the rule being that courts of equity will not interfere because of irregularities in the proceedings. 2 Dillon, 727, 738, 841; Ewing v. St. Louis, 5 Wall., 413; 7 Kan., 178. In the absence of proof to the contrary the city authorities will be presumed to have performed their official duties as required by law. But the appellants untruly allege that the assessment in question was entered in the lien book of the city against the estate of John Montgomery after the land had been sold and become the property of the present appellants, which rendered the assessment illegal and void. It was in point of fact properly reported to the city council a long time before the sale of the land by Mr. Bright, as agent of the heirs to settle the estate, but the entering of it in the lien book was delayed by the consideration and discussion of the question in the council as to what portion of the cost of the culvert and the turning of the run into it should be assumed by it and paid by the city under the provisions of the act, until a decision was reached that it should be the one-half of it, when the assessment as originally returned and reported to the council against the "estate of John Montgomery, deceased," was entered in the lien book accordingly as, of course, it should have been, and credited with the one-half of it assumed by the city. No other assessment against the lands in question was in the meanwhile before the council for its consideration or action, and, of course, it could properly act only on the assessment and order it to be entered therein just as it was originally presented, *Page 128 
which was correct, and order the lien to be entered against the land of the persons who, at the time of making the assessment, were the owners or reputed owners of it.
The allegation that the culvert was not constructed so as to effect the important end of cellar drainage, is not supported by the proof, and is denied; but if it was defective or deficient in that respect, it would not relieve the appellant of the obligation to pay the assessment. 5 Dutcher, 441.
But, it has been repeatedly held with respect to general taxes and local assessments, illegally levied on land, that equity will not restrain a city corporation from selling any land therefor, because the land-owner not only has the remedy by certiorari to review the proceedings, but if he should pay such tax or assessment to save his land from sale under the forms of legal process, he would be entitled to recover back in an action as wrongfully received by the corporation, and is, therefore, not without an adequate remedy at law in such a case. Ewing v. St. Louis, 5 Wall., 413; The Collectorv. Hubbard, 12 Wall., 1; Summer v. Dorchester, 4 Pick., 361; Stetson v. Kampton, 13 Mass., 272 Prestonv. Boston, 12 Pick., 7; Wright v. Boston, 9 Cush., 233; Loud v. Charlestown, 99 Mass., 203; Whitney v.
Boston, 106 Mass., 89; Hunswill v. Boston, 106 Mass., 350; Arnold v. Cambridge, 106 Mass., 352.
The appellants, who were complainants below, obtained a preliminary injunction restraining the defendant corporation from enforcing the payment of an assessment which had been laid on certain real estate belonging to complainants, on Monroe street, in the city of Wilmington, for the construction of a public sewer. After a hearing before the Chancellor, on bill, answer, and depositions, the bill was dismissed, and thereupon an appeal taken to this court. The transactions which led to the application for on injunction are fully set forth in the bill, but the material changes on which the complainants rely for equitable relief are, that the city's officers and agents acted without lawful authority, both in the construction of the sewer and in the manner and *Page 129 
mode of laying the assessment, and that the latter is therefore illegal and void. It is charged that the sewer was made for the purpose of diverting a small water course, which had previously flowed through a portion of the property now assessed and not for the purpose of general drainage; that the diversion of the water course was the exercise of the right of eminent domain without authority, the city governemnt not being invested with legal power to divert the stream; and that, even admitting the possession of the power, the assessment was illegal and void by reason of the neglect or failure of an officer of the city to perform an essential duty in relation thereto, the performance of which duty was necessary to the making of a legal and valid assessment. It appears, from the papers on file, that the water curse was not only of no value to any of the complainants or to the former owners of the assessed property, but by reason of its being an outlet for the refuse of factories and slaughter-houses located higher up the stream, was at times a positive nuisance so that one or more of the complainants, with some sixty residents in the same neighborhood, signed a petition addressed to the City Council requesting that a culvert might be constructed to carry off by perfect drainage all the water coming from above and thus prevent a continuance of what the petitioners represented to be a source of danger to the public health. The fact is not disputed that the petitioners contemplated the construction of the sewer in Monroe street as being the best and most effectual means of removing the difficulties and annoyances of which they complained. The sewer was made under and along Monroe street, from a point above to a point below the complainants' land at a cost of seven thousand two hundred and sixty-six dollars and thirty-five cents, being at the rate of nine dollars and ninety-eight cents per lineal foot, and, the water-course being turned into it the nuisance was entirely abated. There was some attempt to show that the city was in fault in causing the nuisance by not keeping that part of the water-course which was below the complainants' land open and unobstructed, and thus backing up the waters but the evidence does not sustain this. The surface of some of the complainants' land was depressed below the banks of the *Page 130 
stream and the grades of the surrounding streets, making a basin in which, during heavy rains, the flooded waters would collect and remain until carried off by absorption or evaporation. On the completion of the sewer a statement of its cost was presented to the city council, which body ordered that one-half of the said cost should be paid out of the city treasury, and directed that a portion of the remainder, amounting in all to one thousand and thirty-six dollars and ninety-two cents, should be charged against "the estate of John Montgomery," a former owner of the land, now belonging to the complainants, and of which he had died seized and intestate. The property had descended to the children and heirs of John Montgomery, and had continued in their possession as coparceners until a short time before the entry of the assessment upon the lien book of the city. The description in the lien book is a general one, being for 257.8 feet on the west side of Monroe street, between Second and Front streets, and for 157.8 feet on the southeast corner of Second and Monroe streets. The complainants, by claiming ownership of the assessed property, have established its identity and thus removed any objection to the generality and indefiniteness of its description.
The answer, admitting property in the complainants, and the diversion of the water-course, claims that the latter was done at the instance and with the knowledge and approval of the complainants; that the sewer was made for general drainage, and that the assessment was regularly and legally imposed. The cost of the sewer was reported to the city council on May 29, 1873, and the matter of the assessment appears to have been considered by that body at several subsequent meetings until September 11, 1873, when it was finally approved and ordered to be entered on the lien book. In the meantime, in the month of June, in the same year, the assessed property was sold at public sale, by an agent duly appointed for that purpose by the heirs of John Montgomery. The land was divided into building lots and sold to sundry purchasers, now the complainants. The agent retained out of the proceeds of the sale a sufficient sum to pay the assessment, in fulfillment of a condition previously announced, that the assessment would be paid, and the land sold "clear." Part *Page 131 
of the money so retained by the agent he afterwards paid over to the heirs, who protested against the validity of the city's claim. One of the purchasers and a party to the bill deposed that the value of the property was increased three thousand dollars by the sewer.
An amendment to the charter of Wilmington, passed January 30, 1866, confers upon the city council the entire jurisdiction and control of the drainage of the city, with power to pass ordinances for the opening of gutters, drains and sewers, and for the regulating, maintaining, cleansing and keeping the same and the natural water-courses, runs and rivulets within the city limits open, clear and unobstructed, and for the entry upon private land for such purposes, and by general regulations to prescribe the mode in which the work shall be done, and who shall bear the expense thereof, and in its discretion to assess the costs thereof upon the persons and property, real and personal, of those particularly benefited thereby, or of those holding lands through or along which said sewers, drains and water-courses shall flow or pass, and prescribe the mode of collection thereof. The statute provides that private property shall not be taken for public use without just compensation, but is silent as to the mode in which such compensation shall be ascertained. A city ordinance passed June 21, 1866, by virtue of the authority thus given, sets out in detail the manner in which the costs of constructing sewers, etc., shall be assessed. It makes it the duty of the street commissioner to keep an accurate account of the costs of such construction and, through the street committee, to report the same to the council, together with a list of the persons and estates particularly benefited thereby, as well as of those holding lauds through or along which said sewers shall pass, and an estimate of the value of the lands upon which said expense ought to be assessed, the said value to be estimated independently of buildings or improvements. The city council may, or may not, order any part of such expense to be paid out of the general fund, and the whole or remainder, as the case may be, shall be apportioned among those persons and estates particularly benefited, or among those holding lands along which the sewer shall pass. If the *Page 132 
owners be unknown, the assessment shall be generally against the lot or premises by particular or general description. The assessment, being approved by council, shall be entered on the lien book, and may be collected by warrant under the hand and seal of the mayor.
The bill denies the authority of the city to lay a special tax for the payment of the sewer, and assumes that the expense should be wholly defrayed out of the funds produced by general taxation. But the position most earnestly contended for by the complainants is, that the city having constructed a work partly for an unlawful object, namely, the diversion of a natural watercourse without license from the owners thereof, such unlicensed act of diversion being outside of its chartered powers, taints the entire work with illegality, and no portion of the expense can be lawfully assessed on the property-holders, notwithstanding that another and a lawful end may have been intended at the same time. The doctrine insisted on is, that where a tax or assessment is laid partly for a legal and partly for an illegal purpose, and such tax or assessment is entire and indivisible, the whole tax or assessment is illegal and void. The evidence, however, does not warrant the application of this principle to the present case. The city had the power, under the statute of 1866, to regulate and change the flow or direction of the natural drains and water-courses within its limits, to construct sewers and to assess the cost upon the owners of property especially benefited. No authority is given to invade or appropriate private property without compensation; this is expressly prohibited. It is true, the statute does not point out any way of fixing the compensation, but in this instance there is no necessity for ascertaining what might be due for taking for public use a property which was worthless and detrimental to its owners who asked for its removal as a boon, and have derived profit from its loss. These owners, and their privies in estate, stood by and saw the preparations made for depriving them of their property without remonstrance or objection. The building and completion of the sewer occupied several months, and its uses and objects were well known. No attempt was made to interfere with the work, no *Page 133 
was the diversion of the water-course objected to. Some of the complainants requested the city council to carry off by perfect drainage the waters coming from above, and no word of disapproval was heard until the parties benefited were called upon to contribute to the payment of the expense. These facts admit of but one interpretation. The diversion having been made with the consent and approval, and to the evident advantage of the property-owners, the action of the defendant corporation was not illegal or ultra vires. The water-course had no existing or prospective value for the driving of machinery or for domestic uses, and by its continuance in its old channel rendered the lots through which it flowed unsalable. Its appropriation by the city was more of a public burden than a public benefit, while it afforded a special and advantageous relief to the lot-owners. Such an appropriation, under all circumstances, does not fall within the definition of the exercise of the right of eminent domain. We may, therefore, dismiss the further consideraton of the want of power in the city, under the statute of 1866, to make the diversion complained of, and direct our attention to other points presented on behalf of the complainants.
That the expense of local improvements in a town or city may be met by local assessments, in whole or in part, appears to be so well established as to require no discussion. Stroud v.
Philadelphia, 61 Pa. St., 255; 2 Dillon, Mun. Cor., 596 and notes. But when, under what conditions and to what extent, a court of equity should interfere to prevent the collection of such assessments, are questions which have not been uniformly decided. The inconvenience and confusion which might be caused by an indefinite delay in the receipt of municipal or other public revenues, and the serious embarrassments that might follow such delay, are obvious, and courts of equity, have, therefore, been disinclined to put any obstacle in the way of their prompt collection, except under special circumstances, such as left the complainant without any remedy at law, or where it was clear that the tax had been imposed without authority and was absolutely void. Even in the latter case, where the only question is one of excess of authority, depending on purely legal principles, it is doubtful *Page 134 
whether equity should interpose. Those courts which most closely adhere to the distinctions between legal and equitable jurisdiction have generally refused to interfere by injunction with municipal assessments, except in cases which come under some one of the recognized heads of equity jurisdiction, and the doctrine is universally accepted that the collection of a tax will not be enjoined except upon the clearest grounds. The most important question, therefore, to be considered is that of jurisdiction; for, although the arguments addressed to us by counsel were chiefly directed to other matters, this question was not waived, but it was expressly contended on the part of the city that the complainants, whatever might be their rights in a court of law, were not entitled to redress in a court of equity.
The complainants insist upon their right to an injunction for the reason that, the assessment being illegal and void. a threatened sale thereunder for its collection casts a cloud upon their titles, which they have no adequate legal remedy to remove; that such sale would cause them an irreparable injury; that some of the complainants having only an equitable title are absolutely without any remedy at law; and that, to refuse the writ would lead to circuity of action and a multiplicity of suits. These are recognized heads of equity jurisdiction, and we are to inquire whether the complainants' case falls under any one of them.
Is this assessment a cloud upon their titles? It is not every irregular or even void assessment that clouds a title. A lien or incumbrance, to throw a shadow upon title to real property so as to give the owner a right to relief in equity, must be one that is regular and valid on its face, but is in fact irregular and void from circumstances which have to be proved by extrinsic evidence. The test is well defined in Heywood v. The City of Buffalo,14 N.Y., 539, to be where there is an apparent validity in the incumbrance and a total invalidity in fact which can only be proved by evidencealiunde. If the authority under which the assessment was made is unconstitutional, or if the power to tax is conceded, and the officers entrusted with the duty of fixing the tax rate have exceeded their authority, or if from any other cause, appearing on the face of the proceedings, the tax is *Page 135 
irregular and void, it will not affect the title, the defect being visible and undoubted. But a tax may be, from all that appears to the contrary, entirely regular and valid, the authority to levy it may be undisputed and every preliminary step necessary to be taken by way of notice to the owners of property and its valuation, the amount of revenue to be raised and the final apportionment may have been, on the face of the record, in strict compliance with the requirements of the law, and yet, by reason of fraud, corruption or neglect on the part of the officers making the assessment, the tax is void. The record may be false. Notice to owners and valuation of property may not, in fact, have been made, or the assessing officers may have conspired to make an unjust and partial assessment. An assessment or tax made and levied in the manner supposed, being apparently regular and legal, and in reality arbitrary and corrupt, but requiring extrinsic evidence to establish the fact, casts a cloud upon title. The contention here is, that the statute of 1866, which grants power to the city to regulate or change, within its limits, the course of natural rivulets, to construct sewers and assess the costs upon the parties specially benefited by the improvement, is unconstitutional, in so far as it undertakes to give the right of taking private property without providing any mode of ascertaining the amount of compensation to be paid to the owner; and that, waiving this objection and admitting the statute to be valid, certain conditions precedent, prescribed by the city ordinance, and which must be observed in order to make a legal assessment, have not been complied with. It is the duty of the street commissioner, under the ordinance, when he reports to the city council the cost of constructing a sewer, to present at the same time an estimate of the value of the lands upon which said expense ought to be assessed, the value of such lands to be estimated independently of any buildings or improvements thereon. It is charged that the commissioner failed to perform his duty in this respect, and that the records and proceedings of the city council do not show, nor does it appear from any other source, that the required estimate of value was made or presented. The only answer to this is the presumption that official duties have *Page 136 
been regularly fulfilled. Without entering into any inquiry as to the effect of this alleged omission of duty by the commissioner, it is sufficient to know that the omission appears on the face of the proceedings. Conceding, then, all that is claimed by the counsel for the complainants, the assessment is void by reason of its inherent defects. An unconstitutional law confers no authority, and if a city ordinance imposes certain conditions which must be complied with in order to make a legal tax, the failure to comply with any one of the conditions renders the tax void; so that, on the one hand, the city council having acted without authority, and on the other, in violation of its own self-imposed restrictions, the assessment is not binding, creates no lawful lien and does not cloud the titles of the complainants. But all these matters arc wholly within the jurisdiction of a court of law, to be determined by an examination of the statute, an inspection of the journals and records of the city government connected with this particular assessment, and do not call for any outside evidence for the purpose of ascertaining the validity of the tax. Authority in support of this view of what makes a clouded title may be found in the opinion of Chancellor Walworth, in Wigginv. The Mayor, etc., of New York, 9 Paige, 23; a case involving the validity of an assessment for the opening of a street. "If the whole proceedings," says the chancellor, "in relation to the opening were absolutely void in law, and that fact appears upon the face of the ordinance itself, a sale for the assessment upon the claimants' lots would not even create a cloud upon his title. For as every person must be presumed to know the law, a proceeding which is upon its face not only illegal, but absolutely void, does not constitute a cloud upon the title to real estate against which a court of equity will relieve." In Van Doren v. The Mayor, etc., of New York, 9 Paige, 389, the same eminent judge, reaffirming the principle of the previous case, adds: "A valid legal objection appearing upon the face of the proceedings, through which the adverse party can alone claim any right to the complainants' land is not in law such a cloud upon the complainants' title as can authorize a court of equity to set aside or stay such proceedings. But where the claim of the *Page 137 
adverse party to the land is valid upon the face of the instrument, or the proceedings sought to be set aside, as where the defendant has procured and put upon record a deed obtained from the complainant by fraud, or upon a usurious consideration, which requires the establishment of extrinsic facts to show the supposed conveyance to be inoperative and void, a court of equity may interfere and set it aside as a cloud upon the real title to the land." The chancellor cites Simpson v. Lord Howden, 3 My. and Craig, 97, in which it was decided that there is no jurisdiction in equity to order a legal instrument to be delivered up, on the ground of an illegality which appears upon the face of the instrument itself. In Pixly v.
Huggins, 15 Cal., 127, it was held, that if the sale which it was sought to restrain is such that, in an action of ejectment brought by the purchaser under the sale, the real owner would be obliged to offer evidence to defeat a recovery, then such a cloud would be raised as to warrant the interference of equity to prevent the sale. High on Injunction, § 272, recognizes the same rule as settled by the general current of authorities which draw a distinction between cases where the invalidity or illegality charged as the cloud is shown by evidencedehors the record, and where it appears upon the face of the proceedings. And while in the former case the relief is freely granted, in the latter, courts of equity will not interfere. To the same effect is Heywood v, The City of Buffalo, already cited, approved by Ewing v. St. Louis, 5 Wall., 413, and by Dows v.
Chicago, 11 Wall., 108. In Ewing v. St. Louis, the courts say that with the proceedings and determinations of inferior boards or tribunals of special jurisdiction courts of equity will not interfere, unless it should become necessary to prevent a multiplicity of suits or irreparable injury, or unless the proceeding sought to be annulled or corrected is valid upon its face, and the alleged invalidity consists in matters to be established by extrinsic evidence. The most recent case on this point that has come under our notice is Wells v.
The City of Buffalo, 2 Albany Law Journal, 234, which was an application set aside an assessment as a cloud upon the title to the plaintiff's land on the ground that the statute authorizing the assessment was unconstitutional, *Page 138 
and the court held that no cloud could be created by an assessment which was void upon its face, and dismissed the complaint.
The owner of personal or real property, seized or sold under execution for the collection of an illegal municipal tax, has an adequate remedy at law, either by paying under protest the amount demanded, and bringing an action against the city to recover it back, or by an action of trespass for the recovery of damages. In the case of a sale of real property under a void assessment, as in the case of a sale by the sheriff on a void judgment, the purchaser buys at his peril, and the owner may fold his arms in defiance, or, if dispossessed, maintain his rights by an action of ejectment. Under such circumstances the owner can sustain no irreparable injury, and would suffer a loss only by his own passive submission to a wrong. A party claiming title under a corporation tax sale must show that every prerequisite to the power of sale has been complied with, and compliance with law must appear on the face of the proceedings. 2 Dill. on Mun. Cor. 658; The Collectorv. Day, 11 Wall., 113.
A writ of certiorari will afford the owner of property, subject to an illegal assessment, another mode of redress or relief. This remedy is expressly referred to as an appropriate one by Mr. Justice Field in delivering the opinion of the court in Ewingv. St. Louis, and is approved by Judge Dillon in his excellent work on Municipal Corporations. That learned author remarks: "The unquestionable weight of authority in this country is, if an appeal be not given, or some specific mode of review provided, that the superior common law courts will, on certiorari, examine the proceedings of municipal corporations, even although there be no statute giving this remedy; and if it be found that they have exceeded their chartered powers, or have not pursued those powers, or have not conformed to the requirements of the charter or law under which they have undertaken to act, such proceedings will be reversed or annulled. An aggrieved party is, in such case, entitled to a certiorari exdebito justitia." 2 Dill, on Mun. Cor., 740.
Equity will interpose, in a proper case, to prevent a multiplicity *Page 139 
of suits, excessive litigation, or circuity of action. A court of equity, on a bill being filed for a discovery, will sometimes proceed to take jurisdiction of all the matters in controversy between the parties, instead of sending them to a court of law, and thus avoid circuity of action. And so, to prevent a multiplicity of suits, as of one against many, or of many against one, in relation to the same cause of action, the aid of equity may be invoked. But multiplicity does not mean multitude, and equity will not interfere where the object is to obtain a consolidation of actions, or to save the expense of separate actions. Sheldon et al. v. The Centre School District,25 Conn., 224; Dodd v. The City of Hartford, 24 Conn., 232; Lord Tenham v. Herbert, 2 Atkyns, 483; Eldridge v. Hill, 2 Johns. Chan., 283. Or where the claim of right rests on a mere question of law, as for ascertaining the legality of the proceedings of a municipal corporation. West v. The Mayor of Albany, 10 Paige, 539. Chancellor Kent, in Eldridge v. Hill, supra,
says: "Enjoining litigation at law seems to have been allowed in only one of these two cases, either where the plaintiff has already established his right at law, or where the persons who controvert it are so numerous as to render an issue under the direction of this court indispensable to embrace all the parties concerned, and to save multiplicity of suits." A distinction is also to be observed between bills for the prevention of multiplicity of suits or bills of peace, whose object is the suppression of useless and vexatious litigation, and cases where the real object of the relief sought is the consolidation of a number of suits of like nature, since in the former class of cases courts of equity may properly enjoin, but in the latter they will refuse to interfere. Thus, where an injunction was asked to stay proceedings in ninety-two actions of ejectment, until one or more might be tried, the parties, pleadings, title and testimony being the same in all the cases, the relief was refused, the real object sought being a consolidation of the actions which a court of law might properly grant. High on Inj., 329; Peters v. Prevost, 1 Pain C.C., 64. In Penna. Coal Co. v. Del. and H. Canal Co., 31 N.Y., it was said, that where a right can only be adequately protected or enforced by ruinous or expensive law-suits, courts of equity have *Page 140 
interposed their jurisdiction, and have given the party redress by injunction, specific performance or other adequate relief, in order thereby to prevent litigation and the mischief which results from it. Bills of peace, says another authority, have been sustained by the court to settle the rights of parties in a single suit, in cases where the questions to be determined were questions of fact, or mixed questions of law and fact. But no such bill can be sustained to restrain a defendant from suing at law where the rights of the parties depend upon a question of law merely, and where the defendant in a suit at law must eventually succeed in his defense, without the aid of a Court of Chancery, if the law is in his favor. West et al. v.
The Mayor of Albany, supra. The real object sought to be reached by the complainants being a consolidation of their actions, or remedies, against the defendant corporation, they have not presented such a case on the facts and the law as would warrant a court of equity in taking cognizance of their controversy to the exclusion of a common law court which has all the necessary jurisdiction and power to grant them full and adequate redress. It would be an evasion of principle to allow a dozen or twenty property owners to tie up the hands of a tax collector, while the individual owner was compelled to seek his remedy in a court of law. A combination of taxables could at any time arrest the operations of a municipal government by enjoining the collection of taxes and thus subordinate public to private interests.
The charge that some of the complainants, being only equitable owners of a portion of the real estate subject to the lien of the assessment, are absolutely remediless at law, would furnish a strong reason for interference if they were not represented by a trustee duly appointed, who has accepted the trust, is acting in that capacity, and has signed the bill of complaint. Holding the legal title to the land, he is in all respects competent to protect the rights and interests of hiscestuis que trust in a court of law.
The application for an injunction being unsupported by the facts and the settled principles and practice of equity, as we understand them, we think the bill was properly dismissed by the *Page 141 
Chancellor. In coming to this conclusion we have purposely abstained from expressing any opinion on the sufficiency of the main objections to the assessment. The appropriate tribunal for their settlement is the Superior Court, by which they can be heard and determined without interrupting for a single hour the collection of the public taxes, and without impairing the rights or injuring the property of the complainants. *Page 142